Filed 5/9/13  P. v. Corona CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RAMON CORONA,<br><br>    Defendant and Appellant. | H037853<br>(Santa Clara County<br>Super. Ct. No. CC816687) |

Defendant Ramon Corona appeals from a judgment of conviction entered after a jury found him guilty of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c) – count one) and possession of a firearm by a felon (Pen. Code, former § 12021, subd. (a)(1) – count two).  The jury also found that defendant personally used a firearm (Pen. Code, § 12022.53, subd. (b)) and was armed with a firearm (Pen. Code, § 12022, subd. (a)) during the commission of count one.  In a bifurcated proceeding, defendant admitted that he had a prior serious felony conviction (Pen. Code, § 667, subd. (a)) and a prior strike conviction (Pen. Code, §§ 667, subds. (b)-(i), 1170.12).  The trial court sentenced defendant to a total term of 19 years in state prison.

On appeal, defendant contends the trial court erred by:  (1) admitting evidence of a knife recovered from the suspects' vehicle, (2) dismissing a juror who was sleeping during trial, and (3) failing to stay sentence on count two pursuant to Penal Code section

654. We conclude that the sentence on count two must be stayed. As modified, the judgment is affirmed.

## I. Statement of Facts

At about 4:30 a.m. on August 23, 2008, Jacob Hall was returning home when he noticed that a car, which had its headlights off, was behind him. When Hall parked his car across the street from his house, the car pulled up about three feet from his car so that the driver's side of Hall's car was facing the passenger side of the other car. A man in the passenger seat pointed a revolver at Hall's face. Hall ducked as low as he could in his seat. When he did not hear gunshots, he put both of his hands up to indicate that he was unarmed. The man exited the car, walked toward Hall, opened Hall's door, and asked for his wallet. Hall replied, "[Y]ou can have anything you want," and gave him his wallet and cell phone. Hall's wallet contained $3 or $4, credit cards, and identification. While the man was taking Hall's money, the car had made a U-turn and travelled about 50 feet down the street. The man asked Hall if he had anything else. When Hall replied that he did not, the man walked back to the car and entered the front passenger door.

After the car drove away, Hall went into his house and called 911. The police arrived within five to 10 minutes after Hall's call. Hall described the car as a four-door sedan, light in color, and boxy with squared-off edges. Hall described the robber as Hispanic, heavyset, about 200 pounds, and about 5 feet 11 inches tall. According to Hall, the robber was wearing a baseball cap and dark, probably black clothing, and had a bandana covering his face from his nose down. Hall did not see the driver of the car.

At approximately 4:37 a.m. on August 23, 2008, Officer William Stanfill responded to a 911 call for a robbery. After Hall gave him a description of his assailant and the car, Officer Stanfill put out a general broadcast of this information.

At approximately 4:40 a.m. on August 23, 2008, Officer Brian McMahon was on patrol near Eastridge Mall, which is about five minutes from Hall's residence. In response to a dispatch regarding an armed robbery, he identified a vehicle that matched the description of the suspects' vehicle and began following it. This vehicle, which was an older Buick Regal, made an immediate right turn, then another right turn, and failed to stop at a stop sign. After Officer Christopher Kubasta arrived and activated the lights and sirens on his patrol car, Officer McMahon also activated his lights and sirens to enforce a stop. Officer Kubasta tried to block the Buick's path but it went around his patrol car. The driver eventually lost control of the Buick and hit a parked car and then a fire hydrant.

There were three occupants in the Buick: defendant, codefendant Esteban Solorio, and Ernie Guerrero. Officer McMahon took Guerrero into custody. Guerrero was 5 feet 7 inches tall and 140 pounds. Guerrero, who had a slight odor of alcohol on his breath, had been in the backseat of the Buick. Officer Elliott Sagan took defendant into custody. Defendant was 5 feet 10 inches tall, weighed about 220 pounds, and was wearing a red sweatshirt with an Air Jordan logo, a black T-shirt, and black jeans.

Officer Douglas Gates took Solorio, who was the driver and registered owner of the Buick, into custody. Solorio was wearing a black T-shirt, dark-colored jeans, and a red and black Red Sox baseball hat. Solorio was 5 feet 11 inches tall and weighed 205 pounds. After Officer Gates transported Solorio to the police department, Solorio told him that he had been drinking earlier in the evening. He also said that when the patrol car pulled in behind him, he became scared because he had a loaded gun, which he had purchased a few years earlier. He threw the gun out of his car when the officer turned on the lights of the patrol car. Solorio did not remember what he had been doing immediately before the police stopped him because he was drunk. He had no explanation

3

for why Hall's wallet and cell phone were in his car. In Officer Gates's opinion, Solorio did not appear to be impaired by alcohol.

At about 5:00 a.m., Officer Stanfill took Hall to see if he could identify any of the individuals who had been detained. Hall viewed the suspects, who were standing about 20 to 25 yards away. The first suspect was Solorio. Hall said that he was 90 percent sure that he was the robber because he was "a heavyset male wearing a black, long-sleeve shirt and dark-colored, possibly black pants and a black baseball cap." The next suspect was defendant. Hall was 70 percent sure that he was the robber. He based his decision on the fact that he had the "same general build," but he noted that defendant was wearing a red shirt instead of a black shirt.

When Officer Kubasta searched the Buick, he found a folded-up red bandana in the glove box, an 11-inch kitchen knife on the floorboard behind the front seat, a wallet containing $4 and Hall's identification, Hall's cell phone, and a black neoprene face mask. He also found a red Sharks hat with "408" on it and a Boston Red Sox baseball cap. No gun was found in the Buick. However, the gun was eventually located after Solorio described the area in which he had thrown it. The gun was a Smith and Wesson .38 Special revolver, which had six live rounds in it.

Teresa Shab, a criminalist, testified as an expert in the area of screening for biological material and DNA analysis. Shab was unable to obtain any DNA results from the swabs taken from the gun. The red San Jose Sharks hat had DNA from at least five individuals, including Solorio as a possible major contributor. The black baseball hat had DNA from at least three individuals, including Guerrero as a possible major contributor. The Boston Red Sox hat had DNA from at least three individuals, including defendant as a major contributor. The red bandana had DNA from at least four individuals, including Solorio as a possible major contributor. The black mask had DNA from at least three

individuals with defendant as a possible major contributor and Solorio as a possible minor contributor.

The parties stipulated that defendant had previously been convicted of a felony.

## II. Discussion

### A. Admissibility of Evidence

Defendant contends that the trial court erred by admitting evidence regarding the kitchen knife recovered from the suspects' vehicle.

Prior to trial, the defense sought to exclude testimony regarding the recovery of an 11-inch kitchen knife, which had been wrapped in a red bandana, from the floorboard of the suspects' vehicle. The trial court ruled: "I am going to deny the motion to exclude the knife in its entirety, although I am going to grant the request to exclude reference to the knife having been wrapped in a bandana or a red bandana. [¶] The knife itself is relevant. It was found in the passenger compartment in the same location as the black face mask. It was accessible to the driver and the passenger in the car. And it is relevant to show an indication that the persons were armed with more than a firearm. It is no more prejudicial than the firearm, about which there will be evidence. [¶] So I do find that the probative value is not substantially outweighed by the probability that the admission of that evidence will either necessitate undue consumption of time or create substantial danger of undue prejudice of confusing the issues or of misleading the jury, under Evidence Code section 352."

At trial, Officer Kubasta testified that he searched the suspects' car and found an 11-inch kitchen knife on the floorboard of the car. On cross-examination, Officer Gates testified that the knife was found wrapped in a red bandana.

" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

5

(Evid. Code, § 210.) "When the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Riser* (1956) 47 Cal.2d 566, 577, overruled on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98 and *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2.) However, evidence of weapons other than the murder weapon is admissible when relevant for other purposes. (*People v. Cox* (2003) 30 Cal.4th 916, 956, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Hamilton* (2009) 45 Cal.4th 863, 930.)

The Attorney General argues that the evidence was "relevant to establish the joint enterprise which constituted the robbery." This argument would have merit if there had been any evidence that the knife was used, or even seen by the victim, during the robbery. Here, however, Hall told the police immediately after the event and testified at trial that he was robbed by a man with a gun. He never mentioned that he was threatened by or saw a knife. Given that there was no dispute that the only weapon used during the robbery was a gun, this evidence had no probative value as to any disputed issue in the case. Accordingly, the trial court abused its discretion in admitting testimony regarding the knife.

Defendant argues that the admission of this evidence deprived him of his rights to due process and a fair trial. He points out that the prosecutor argued that he and Solorio intended to commit a robbery because they brought a mask, a knife wrapped as a weapon, and a loaded gun, and thus the "admission of the knife did nothing but demonstrate to the jury that [he] was the sort of person who carries around deadly weapons."

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair.* [Citations.] Absent

6

fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

In the present case, the trial court ruled that the evidence was admissible under Evidence Code section 352. This ruling did not preclude defendant from presenting a defense or render the trial fundamentally unfair. Thus, the error was not a constitutional violation. In applying the *Watson* standard, we conclude the error was not prejudicial. The front passenger exited the Buick, pointed a gun at Hall, and took his wallet and cell phone. Police recovered Hall's possessions from the Buick about 15 minutes after the robbery. Solorio and defendant were similar in height and weight. When Hall viewed the suspects that night, he was 90 percent sure of his identification of Solorio. He was 70 percent sure of his identification of defendant, because Solorio's clothing was closer to that of the robber. When the police stopped the Buick shortly after the robbery, Solorio was the driver and he told Officer Gates that he had been "driving around" after drinking at a house earlier. Thus, it is not reasonably probable that the result would have been more favorable to defendant absent the error. (*People v. Watson* (1946) 46 Cal.2d 818, 836.)

## B. Dismissal of Juror

Defendant contends that the trial court's sua sponte dismissal of Juror No. 4 denied him his right to a fair trial and due process of law.

At the end of the prosecution's presentation of testimony, the trial court asked Juror No. 4 to stay after the other jurors were dismissed. The trial court asked Juror No. 4 if she was having any trouble staying awake during the testimony. She responded, "Some. Yes." She stated that she was "dozing occasionally." She did not think that she

7

dozed off during the previous afternoon's testimony, but she admitted that she had dozed off "once or twice" that morning. She heard "most" of Shab's testimony. When the trial court asked her whether she "missed something," she replied, "No. Not too much. No." She stated that she heard all of the testimony of Officers Gates, Sagan, and McMahon and estimated that she dozed off for "[p]robably about three or four minutes" during Shab's testimony.

At the beginning of the session the next morning, the prosecutor objected to keeping Juror No. 4 on the panel. Over a defense objection, the trial court dismissed the juror. The trial court stated: "I am going to find, under Penal Code section 1089, upon good cause shown to the court, I am going to find that Juror N[o.] 4 is unable to perform her duty because she was sleeping. I am going to discharge Juror N[o.] 4 based on convincing proof that she was actually sleeping during a material portion of the trial. [¶] I inquired of Juror N[o.] 4 at the end of the session Tuesday, because from her position in the chair and various physical symptoms during the morning's testimony, I could not tell if she had dozed off, but it appeared that she might have. [¶] In her voir dire, Juror N[o.] 4 admitted that she had, in fact, dozed off during the testimony of Ms. Shab. Not only had she dozed off, but Juror N[o.] 4 admitted that she missed testimony and estimated that she missed three to four minutes of testimony. Even three to four minutes of testimony is a significant amount of testimony, for example, that was the length of one attorney's -- one attorney's cross-examination of Ms. Shab. And there was only 1 1/2 days of testimony in total. [¶] In addition, I had inquired of [Juror No. 4], based on the court's observation during the morning, that her eyes appeared to be closing. Her head was nodding. She was slumping in her chair. And I did observe that conduct during Ms. Shab's testimony. I believe that Ms. -- I believe that Juror N[o.] 4 underestimated the amount of testimony she missed based on the court's own observation of those symptoms during the morning. [¶] I noticed the same type of symptoms during the

8

testimony of other witnesses during the morning session, including the other officers. [¶] I also noticed similar conduct on the previous afternoon. Even though Juror N[o.] 4 denied that she had dozed off on the afternoon before, I believe based on viewing her during the testimony and viewing her during the voir dire that she was probably embarrassed and underestimated the amount of time she had -- the amount of testimony she had missed and the number of times she had dozed off. [¶] So, again, I am going to find good cause that she is unable to perform her duties. And I'm going to discharge her based on her sleeping during material portions of the trial."

"The trial court has the authority to discharge jurors for good cause, including sleeping during trial. [Citations.] When the trial court receives notice that such cause may exist, it has an affirmative obligation to investigate. [Citations.] Both the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.)

Defendant argues that the trial court did not determine that Juror No. 4 was unable to perform her duties. He claims that "[t]here is nothing on the record to suggest that [she] missed material portions of testimony," because the trial court "failed to specifically question the juror about the DNA analyst Shab's testimony that would have indicated if she had missed anything quantifiable."

Here, Juror No. 4 admitted that she missed three or four minutes of Shab's testimony, which the trial court noted was the length of one attorney's cross-examination of Shab. Based on its own observations of Juror No. 4's closed eyes, nodding head, and slumped position in her chair during Shab's testimony and during prior court sessions as well as her demeanor when being questioned, the trial court concluded that Juror No. 4 had underestimated the amount of time that she had been sleeping during the trial. Under these circumstances, the trial court was not required to question her about her knowledge

9

of the case.  Accordingly, the trial court did not abuse its discretion in dismissing Juror No. 4.

### C.  Penal Code Section 654

Defendant also contends that the trial court erred by failing to stay the sentence for count two (possession of a firearm by a felon) pursuant to Penal Code section 654.

Here, the jury found defendant guilty of robbery and possession of a firearm by a felon and that he had personally used a firearm during the robbery.  The trial court imposed sentences for both offenses, to be served concurrently.

Penal Code section 654 provides, in relevant part, that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Thus, this statute precludes multiple punishment "where the convictions arise out of an indivisible transaction and have a single intent and objective.  [Citation.]"  (*People v. Monarrez* (1998) 66 Cal.App.4th 710, 713.)  "Where a defendant entertains multiple criminal objectives independent of and not merely incidental to each other, he may be punished for more than one crime even though the violations share common acts or are part of an otherwise indivisible course of conduct.  [Citation.]"  (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)  However, "if the evidence demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense, section 654 will bar a separate punishment for the possession of the weapon by an ex-felon."  (*People v. Ratliff* (1990) 223 Cal.App.3d 1401, 1412.)  The trial court's determination that a defendant maintained multiple criminal objectives is a question of fact that must be upheld if supported by substantial evidence.  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

10

Relying on *People v. Jones* (2002) 103 Cal.App.4th 1139 (*Jones*), the Attorney General contends that the trial court could have reasonably concluded that the present case did not involve "the fortuitous possession of a handgun only at the moment of the commission of a crime apart from the mere act of firearm possession by a felon."

*Jones*, *supra*, 103 Cal.App.4th 1139 states: " " "Whether a violation of section 12021, forbidding persons convicted of felonies from possessing firearms concealable upon the person, constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each individual case. Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense." ' [Citations.]" (*Id.* at pp. 1143-1144, fn. omitted.)

In the present case, Solorio was the owner of the firearm. He admitted that he purchased it and that he disposed of it while he was being pursued by the police. The Attorney General has pointed to no evidence that suggests that defendant had possession of the firearm either prior to or after the robbery. Thus, there was insufficient evidence to support the trial court's implied finding that defendant had separate objectives in committing the robbery and possessing the firearm. Accordingly, the sentence imposed for count two must be stayed.

### III. Disposition

The abstract of judgment is ordered modified to reflect that the sentence imposed for count two is stayed pending the finality of the judgment and service of the sentence

11

on count one and the sentence enhancement allegations.  As modified, the judgment is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.